**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| LUIS MANUEL RODRIGUEZ | : | No. 17-618 |

**MEMORANDUM**

**Padova, J.**                                                                                              **June 24, 2020**

Defendant Luis Manuel Rodriguez has filed a motion for release pursuant to the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A), arguing that the court should reduce his sentence to time served and release him from the Federal Correctional Institution at Danbury ("FCI Danbury") because of the COVID-19 pandemic and his medical conditions. The Government opposes Defendant's Motion on the grounds that Defendant has not demonstrated the extraordinary and compelling circumstances necessary to obtain relief under § 3582(c)(1)(A).[1] We held argument on Defendant's Motion by videoconference on June 8, 2020. For the following reasons, we now deny Defendant's Motion.

**I.      BACKGROUND**

We sentenced Defendant on November 15, 2018, to a 120-month mandatory minimum term of imprisonment following his guilty plea to a single count of attempted possession with intent to distribute five kilograms of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A). Defendant is currently serving his sentence at FCI Danbury. In an April 3, 2020 Memorandum to the Director of the Bureau of Prisons ("BOP"), Attorney General William Barr

---

[1] The parties are in agreement that Defendant has exhausted his administrative remedies with the Bureau of Prisons, because he submitted an administrative request to the Warden at FCI Danbury on April 16, 2020, and the Warden denied his request. (See Administrative Request, Def.'s Mot. Ex. F.)

identified FCI Danbury as one of several facilities that were "experiencing significant levels of infection" from the COVID-19 pandemic, and he directed that the BOP "move with dispatch in using home confinement, where appropriate to move vulnerable inmates out of these institutions." Memo. from Attorney Gen. William Barr to Director of BOP, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), at https://www.justice.gov/file/1266661/download.  As of May 4, 2020, there were 719 male inmates at FCI Danbury.  (Decl. of D. Easter ("Warden Decl."), Gov't Resp. in Opp'n to Def.'s Mot. ("Gov't Resp.") Ex. 2, ¶ 5.)  On June 24, 2020, the BOP website reported that, as of June 23, 2020, one inmate and one staff member at FCI Danbury were positive for the COVID-19 virus, one inmate had died from the virus, and 156 inmates and staff had recovered from the virus.  See Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (accessed June 24, 2020).

Defendant is 33 years old and has served approximately 30 months of his 120-month sentence.  His projected release date is May 29, 2026.  According to Defendant, the "[c]onditions at . . . FCI Danbury create an ideal environment for the transmission of COVID-19."  (Def.'s Mot. at 4.); see also  United States v. Raia, 954 F.3d 594, 596 (3d Cir. 2020) (noting that COVID-19  is "a highly contagious respiratory virus which . . . poses unique risks in population-dense prison facilities" (citations omitted)).  He asserts that he is "double bunked in a large dorm-type area with 40 inmates sharing a single telephone and common eating area."  (Id. at 5.)  In a Declaration, the Warden of FCI Danbury states that the institution has implemented BOP's national action plan for COVID-19, in compliance with national directives.  (Warden Decl. ¶ 22.)  The plan, among other things, institutes procedures that limit the number of inmates with whom any one inmate will come into contact; provides for enhanced sanitation procedures, including the wide use of disinfectants;

requires staff and inmates to wear masks; and requires staff to undergo regular health screenings, including temperature checks.  (See id.  ¶¶ 23, 31-38, 48, 52, 55.)

Defendant's medical records that have been submitted in connection with his Motion reflect that, in 1990, when Defendant was three years old and living an another country, he was diagnosed with Ischaemic Heart Disease, which over time can cause the heart to enlarge.  (Def.'s Mot. Exs. C-D.)  After that time, his pediatrician saw him infrequently "because of him getting better and [his] leaving the country" in February of 1995, when he was seven years old.  (Id. Ex. D.)  Also as a child, Defendant tested positive for tuberculosis ("TB").  (See id. Ex. E.)  Thereafter, while in prison in June of 2019, Defendant was diagnosed with latent TB, and was put on a treatment protocol.  (Def.'s Prison Med. Records ("Def.'s Med. Rcds."), Gov't Resp. Ex. 1, at 7, 21-22, 25.)  His prison records indicate that he suffered no side effects from that protocol and had no complaints.  (Id. at 21-22.)  The latent TB treatment protocol was completed by October of 2019.  (Id. at 3.)  Meanwhile, Defendant's medical records also indicate that, in July of 2019, he tested positive for hepatitis B.  (Id. at 31.)

## II.   LEGAL STANDARD

As a general rule, a district court may not modify a defendant's sentence after it has been imposed.   18 U.S.C. § 3582(c); see also Dillon v. United States, 560 U.S. 817, 825 (2010).  However, the First Step Act provides for a compassionate release exception to that general rule, stating that:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term

of imprisonment), after considering the factors set forth in section 3553(a)
to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction;

> \*     \*     \*

> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A); see also U.S.S.G. § 1B1.13 (stating that the court may reduce a term of imprisonment if it finds, after consideration of the factors in § 3553(a), that "[e]xtraordinary and compelling reasons warrant the reduction," "[t]he defendant is not a danger to the safety of any other person or to the community," and "[t]he reduction is consistent with this policy statement"). Although neither U.S.S.G. § 1B1.13 nor Congress defines the term "extraordinary and compelling," the Sentencing Commission's commentary to § 1B1.13, provide guidance. See U.S.S.G. § 1B1.13 cmt. n.1. The commentary provides that "extraordinary and compelling reasons" can include (1) certain specified serious medical conditions (a terminal illness or a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care" in prison and "from which he or she is not expected to recover"); (2) the defendant's advancing age (over 65), in combination with a serious deterioration of his health and his successful completion of at least 10 years or 75% of his sentence; (3) the defendant's family circumstances, and (4) "[o]ther [r]easons . . . [a]s determined by the Director of the Bureau of Prisons" to be extraordinary and compelling, either alone or in combination with the three prior reasons. U.S.S.G. § 1B1.13, cmt. n.1.

In United States v. Raia, 954 F.3d 594 (3d Cir. 2020), the United States Court of Appeals for the Third Circuit considered a compassionate release petition based on the existence of COVID-19 and stated that it:

> [does] not mean to minimize the risks that COVID-19 poses in the
> federal prison system, particularly for [older inmates with pre-
> existing conditions].   But the mere existence of COVID-19 in
> society and the possibility that it may spread to a particular prison
> alone cannot independently justify compassionate release,
> especially considering BOP's statutory role, and its extensive and
> professional efforts to curtail the virus's spread.

Id. at 597 (citation omitted.  Likewise, "the existence of some health risk to every federal prisoner

as the result of this global pandemic does not, without more, provide the sole basis for granting

release to each and every prisoner within our Circuit."  United States v. Roeder, No. 20-1682, 2020

WL 1545872, at *3 n.16 (3d Cir. Apr. 1, 2020).

## III.   DISCUSSION

In his Motion, Defendant concedes that neither his age (33 years old) in combination with

his health and completion of 30 months of his 120-month sentence nor his family circumstances

present extraordinary and compelling reasons for his release under the Sentencing Guidelines'

commentary, and he also concedes that his medical conditions are not of the type that are

specifically identified as potentially extraordinary and compelling in that same commentary.  See

U.S.S.G. § 1B1.13, cmt. n.1.  He nevertheless argues that his medical conditions (specifically, his

heart condition, hepatitis B, and latent TB), in combination with the presence of COVID-19 at FCI

Danbury constitute extraordinary and compelling reasons for his release.

As noted above, the evidence is that COVID-19 has arrived at FCI-Danbury and has not

only infected over 150 inmates and staff, but has also killed one inmate. See Bureau of Prison,

COVID-19 Coronavirus,  https://www.bop.gov/coronavirus/ (accessed June 24, 2020). The

disturbing presence of COVID-19 at the prison, however, does not entitle every offender with a

medical condition to compassionate release.  See Roeder, 2020 WL 1545872, at *3 n.16.  Rather,

Defendant must establish that the risks to him, in light of his individual medical conditions and

5

other circumstances, are so extraordinary and compelling that we should release him less than three years into his mandatory ten-year sentence.

As an initial matter, Defendant has not produced evidence that his childhood heart condition is ongoing, much less that it makes him more vulnerable to COVID-19 or more likely to have severe symptoms if he contracts the virus.  There is simply no evidence in the record that he continues to suffer from the heart condition with which he was diagnosed at age three and, in fact, the medical records that he has submitted indicate that, by the time he was seven years old, his doctor was seeing him infrequently because he was "getting better."  (Def.'s Mot. Ex. D.) Accordingly, Defendant's professed heart condition in no way supports his claim of extraordinary and compelling reasons for release.

Similarly, Defendant has provided us with no basis on which to conclude that his documented hepatitis B puts him at greater risk of COVID-19.  The Centers for Disease Control and Prevention ("CDC") website states in response to the question "Are people with hepatitis B virus or hepatitis C at higher risk for COVID-19 than other people?" that "[c]urrently, [it has] no information about whether people with hepatitis B or hepatitis C are at increased risk for getting COVID-19 or having severe COVID-19."   Center for Disease Control and Prevention, Coronavirus Disease 2019, *What to Know About Liver Disease and COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (accessed June 24, 2020).  We have also found no cases in which a court has found a hepatitis B diagnosis to provide a sufficient medical basis for a compassionate release request.  See also United States v. Ram, Crim. A. No. 13-50045, 2020 WL 3100837, at *2-3 (W.D. Ark. June 11, 2020) (rejecting defendant's claim for compassionate release that was based, in part, on the assertion that defendant had hepatitis B and "issues" related to that diagnosis, where defendant failed to describe the nature

of his "issues" and did not assert that he suffered from serious complications arising from a diseased or scarred liver); United States v. Mohammed, Crim. A. No. 19-290, 2020 WL 3080176, at *2 (D.D.C. June 9, 2020) (denying compassionate release for inmate claiming "liver disease caused by his Hepatitis B condition"); United States v. Qazi, Crim. A. No. 16-20437, 2020 WL 2526118, at *2-3 (E.D. Mich. May 18, 2020) (denying compassionate release for 49-year-old inmate with diabetes, hyperlipidemia, hepatitis B, and sleep apnea, finding threat of COVID-19 to be too speculative).  Accordingly, we place no meaningful weight on Defendant's positive hepatitis B test.

Finally, while Defendant's medical records indicate that he has latent TB, the records also indicate that his condition is controlled, he is asymptomatic, and he has successfully completed his treatment protocol.  (See Def.'s Med. Rcds. at 3, 7, 21-22, 25.)  The CDC website states only that "TB patients who are at least 65 years old; have respiratory compromise from their TB; or other medical conditions, including HIV and other immunocompromising conditions, are at greater risk for severe COVID-19 infection."  Centers for Disease Control and Prevention, *Tuberculosis and Public Health Emergencies*, https://www.cdc.gov/tb/education/public-health-emergencies.htm (accessed June 24, 2020).  As Defendant is only 33 years old and has submitted no evidence that he is suffering from any respiratory compromise or is otherwise immunocompromised, he does not qualify under this published guidance as being at greater risk of severe COVID-19.  Similarly, the World Health Organization website, in response to a question of whether "people with tuberculosis are likely to be at increased risk of COVID-19 infection, illness and death," responds that "experience on COVID-19 infection in tuberculosis (TB) patients remains limited," and acknowledges only that "it is anticipated that people ill with both TB and COVID-19 may have poorer treatment outcomes, especially if TB treatment is interrupted."  World Health Organization,

*Q&A: Tuberculosis and COVID-19,* https://www.who.int/news-room/q-a-detail/tuberculosis-and-the-covid-19-pandemic (accessed June 24, 2020).  This, too, is of only marginal help to Defendant whose submitted medical records indicate that his latent TB is asymptomatic and that his treatment protocol was successfully completed.  (<u>See</u> Def.'s Med. Rcds. at 3, 7.)  Finally, we have found only a few cases in which inmates with latent TB have been granted compassionate relief during the COVID-19 pandemic and in all of those cases, there were other critical circumstances that contributed to the court's decision to grant release, including the presence of another, more critical underlying condition that increased the inmate's COVID-19 risk, advanced age, and/or an upcoming release date.  <u>See</u> <u>United States v. Burke</u>, Crim. A. No. 17-3089, 2020 WL 3000330, at *2 (D. Neb. June 4, 2020) (granting compassionate release to  inmate who had "relatively little time left to serve" on her sentence and suffered from hypertension, i.e., "a recognized comorbidity associated with severe cases of COVID-19," and noting that inmate's latent TB diagnosis was also "relevant" even though "[r]esearch has yet to conclusively establish the risks associated with . . . latent tuberculosis" (citations omitted));   <u>United States v. Barrenechea</u>, Crim. A. No. 92-403-MMC-3, 2020 WL 2315638, at *1 (N.D. Cal. May 7, 2020) (granting compassionate relief for inmate of advanced age with latent TB,[2] who had  served nearly 28 years of a mandatory life sentence for a nonviolent drug crime for which Congress had subsequently reduced the mandatory minimum sentence to 25 years); <u>United States v. Atwi</u>, Crim. No 18-20607, 2020 WL 1910152, at *5 (E.D. Mich. Apr. 20, 2020) (granting compassionate relief to inmate serving 4-month sentence where it was "unclear if and when the prison w[ould] begin the treatment required to prevent [his]

---

[2] Although the opinion in this case does not specify the inmate's age, the  motion for reduction of sentence states that he is 66 years old.  <u>See</u> Mot. for Reduction of Sentence (Compassionate Release) Pursuant to 18 U.S.C. § 3582(c)(1)(A) at 20, <u>United States v. Barrenechea</u>, Crim, A. No. 92-00403-MMC-3 (N.D. Ca. Apr. 22, 2020), ECF No. 2432.

latent TB from developing into the active TB disease"). We therefore conclude that Defendant has failed to establish that his asymptomatic latent TB puts him at greater risk of COVID-19 or that his latent TB.

In sum, there is no evidence in this record from which we can conclude that Defendant's childhood heart condition, hepatitis B, and/or asymptomatic latent TB for which he has received a full course of treatment put him at greater risk of COVID-19. We therefore simply cannot conclude that Defendant's medical conditions, together with the current conditions at FCI Danbury, provide any extraordinary and compelling reason that warrants a sentence reduction at this time, particularly where Defendant is relatively young and has thus far served less than one third of his 120-month mandatory minimum sentence.[3]

---

[3] Defendant urges us to conclude that he has satisfied his burden of establishing extraordinary and compelling reasons, relying on two cases that he says involve inmates in circumstances similar to his own. In the first, United States v. Jeremy Rodriguez, Crim. A. No. 03-271, -- F. Supp. 3d --, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), the court granted compassionate release to Jeremy Rodriguez, who had served seventeen years of a twenty-year mandatory minimum sentence for drug distribution and firearm possession, and suffered from diabetes, high blood pressure and liver abnormalities. Id. at *1. However, Jeremy Rodriguez, unlike Defendant, had submitted medical records that explicitly stated that he "is in the higher risk category [for grave illness or death if he contracts the COVID-19] as a result of the immunosuppression from . . . Type 2 Diabetes" and that "[w]ere he to contract the virus, he would be at a higher risk of morbidity and mortality due to his liver abnormalities, obesity and hypertension." Id. at *7 (citations omitted) (second alteration in original). Moreover, Jeremy Rodriguez's proximity to his release date also played an important part in the court's decision to grant him compassionate release. See id. at *11 ("Without the COVID-19 pandemic . . . Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.") Thus, we easily distinguish Jeremy Rodriguez's case from that of Defendant.

Defendant also argues that his case is similar to that of Ernesto Luis Delgado, an inmate at FCI Danbury who had served just 29 months of a ten-year sentence, suffered from severe obesity and sleep apnea, and was granted compassionate release. United States v. Delgado, Crim. A. No. 18-17-(VAB)-1, -- F. Supp. 3d --, 2020 WL 2464685, at *2-3 (D. Conn. Apr. 30, 2020). However, unlike Defendant's documented conditions, severe obesity is recognized by the CDC as a condition that "puts people at higher risk for complications from COVID-19." Centers for Disease Control and Prevention, Coronavirus Disease 2019, *Groups at Higher Risk for Severe Illness*,

## IV.    CONCLUSION

For the foregoing reasons, we deny Defendant's Motion for Release under 18 U.S.C. §

3582(c)(1)(A)(i). [4]  We are nevertheless mindful of the seriousness of the threat that the COVID-

19 pandemic poses to the prison population as a whole, as well as the fact that Defendant's medical

condition could potentially deteriorate in light of his existing hepatitis B and latent TB diagnoses.

Accordingly, Defendant may renew his request for compassionate release should his medical

condition change, and we expect that the Bureau of Prisons will likewise reconsider any requests

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html
(accessed June 24, 2020).  Accordingly, we do not find either Delgado or Rodriguez to support a
conclusion that Defendant's compassionate release motion should be granted under the
circumstances presented here.

[4] In the alternative, Defendant requests that we release him to home confinement under 18
U.S.C. § 3624(c)(2) and the Coronavirus Aid, Relief, and Economic Security ("CARES") Act,
Pub. L. No. 116-136, 134 Stat. 281 (2020), or grant him a furlough pursuant to 18 U.S.C. § 3622
until the pandemic has ended.  However, our authority is limited to that given to us in 18 U.S.C. §
3582(c)(1)(a), which does not include the authority to grant temporary release to home
confinement or a furlough.  See 18 U.S.C. § 3621(b) (stating that BOP's designation decision is
not subject to judicial review); United States v. Mansaray, Crim. A. No. 13-236, 2020 WL
3077184, at *3 (E.D. Pa. June 10, 2020) ("Congress did not provide the Courts with the authority
to review the BOP Director's decision whether to release inmates into home confinement at an
earlier time under the CARES Act" (citations omitted)); United States v. Park, Crim. A. No. 16-
473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (stating that "the mechanism for granting
temporary release – 18 U.S.C. § 3622(a) – lies solely in the BOP's hands, leaving the Court without
any authority to grant [that] relief"); United States v. Haney, Crim. A. No. 19-541, 2020 WL
1821988, at *7 (S.D.N.Y. Apr. 13, 2020) (stating that the compassionate release provision of 18
U.S.C. § 3582(c) "says nothing about temporary release or other such exotic possibilities.  In
ordinary language, a sentence reduction is far different from a temporary release, and the absence
of any reference to temporary release in the statute is, if anything, further confirmation that it was
not contemplated" (internal citations omitted)).

that Defendant makes for temporary release or home confinement should he establish an increased and verifiable threat to his health and well-being.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.